# EXHIBIT G

1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF CONNECTICUT

3

4

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

6   SANDRA SMITH, As Executrix of
    the Estate of Josephine Giaimo, :

7

8                      Plaintiff,      :
                                               Civil Action
9            -versus-                  : No. 3:01 CV 1375
                                                  (AHN)
10  TOWN OF EAST HAVEN,                :
    Individual Officers:
    Mike D'Amato, Badge #0430;         :
11  David Torello, Badge #1750;
    John Cascio, Badge #0310;          :
12  Lisa Scaramella, Badge #1580;
    and Kevin McCarthy, Badge #1080,:

13

                      Defendants.      :
14
    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
15

16

17                  Deposition of JOHN CASCIO,

18      taken pursuant to the Federal Rules of Civil

19      Procedure, at the law offices of Jacobs,

20      Grudberg, Belt & Dow, P.C., 350 Orange

21      Street, New Haven, Connecticut, before James

22      A. Martone, L.S.R. #00248, a Notary Public

23      in and for the State of Connecticut, on

24      February 6, 2003, at 10:20 a.m.

25

SANDERS, GALE & RUSSELL
(203) 624-4157

1       Q.    Why don't you tell me first, had he
2  ever threatened her, made any sorts of threats?
3       A.    He never made direct threats, according
4  to her.  He did intimate that he -- he made it
5  known that he had a handgun permit.  He talked
6  about it all the time.  And that seemed to get
7  her nervous.  She felt intimidated by that.  Not
8  having been there, to see -- to view how it was
9  said, you know, she was intimidated and felt
10  threatened.  I don't know how he presented it to
11  her.  I wasn't there.
12       Q.    Okay.
13       A.    But according to her, she felt it made
14  her -- she felt intimidated.
15       Q.    Okay.
16       A.    So that could be considered --
17  depending on how -- in what context it was said,
18  it could have been considered a threat.
19       Q.    Okay.  And when you just mentioned not
20  having been there, you meant the two of them had
21  a conversation prior to your speaking with her,
22  which she told you about, but you weren't there?
23       A.    I don't know what vein this stuff was
24  said in.
25       Q.    Okay.

1        A.    So I don't know.  But she said she felt

2    intimidated by his talk of gun permits all the

3    time.

4        Q.    Okay.

5        A.    I did ask her did he ever threaten to

6    shoot you, or use a gun, she said no.

7        Q.    Okay.

8        A.    Okay.

9        Q.    Did you ask her whether he had owned

10   guns or had guns?

11       A.    Yes.

12       Q.    And what did she say to that?

13       A.    She thought he did but she wasn't

14   sure.

15       Q.    Okay.  And did she tell you when these

16   conversations -- whether it was one conversation

17   which he told her --  Withdrawn.

18            I think you mentioned in your

19   answer that she had said he had said it several

20   times?

21       A.    She said he talked about it all the

22   time.

23       Q.    Okay.

24       A.    But -- he talked about it all the time,

25   and I don't know how many times, but all the

1    in dog, dash 114, in New Haven.

2        Q.    Okay.  All right.

3        A.    And I got an answering machine.

4        Q.    And what then did you do?  Did you take

5    any other action?

6        A.    Well, on the answering machine, I left

7    a message telling him that I needed to speak to

8    him.

9        Q.    And when did you make that call?

10        A.    I'm not sure.  It was sometime after I

11    left her residence.

12        Q.    Was it that day or a different day?

13        A.    It would have been the next day, I

14    think, because it was past midnight.  I believe

15    it was after I left at some point.

16        Q.    Would you have called immediately or

17    would you have waited until a morning hour?

18        A.    I can't remember.  I -- I'm going to

19    say I called earlier because in the morning when

20    I got off from work, on my own time I went to Mr.

21    Cosenza's apartment complex looking for him.

22        Q.    Okay.  And is that -- actually just

23    before we get to that question, what did you tell

24    Miss Giaimo with respect to what you were -- what

25    action you were going to take?  In other words,

1  after getting all the information from her, what

2  did you say to her?

3      A.   I told her I was going to attempt to

4  contact him.

5      Q.   Okay.

6      A.   However, I couldn't remand him to see

7  me.  All right.  I can attempt to contact him.  I

8  would do my best.  And I would speak to him about

9  his behavior, and inform him that if -- put up

10  the boundaries, and if he crossed them, he was

11  going to get arrested.  I was going to set the

12  boundaries with him.

13      Q.   Okay.

14      A.   What I needed her to do for me, and for

15  herself, was to -- and she had already been I

16  guess in initial discussions with her lawyer

17  about this -- was to move forward and get a

18  restraining order.

19      Q.   Okay.

20      A.   All right.  I told her this gave me the

21  tools in order to garner some control over Mr.

22  Cosenza.  Without them, it was very difficult

23  because he -- you know, was his behavior

24  inappropriate?  Yes.  Was it criminal?  You know,

25  it was on the border.  It wasn't definitively --

1    I couldn't articulate in writing that he was

2    committing a crime here.

3         Q.   Okay.

4         A.   And the part about the gun permit came

5    up.  However, it wasn't the -- didn't dominate

6    our conversation.  It was a small part of our

7    conversation.  Okay.  She mentioned it to me.

8         Q.  All right.

9         A.   She did mention it again, and I told

10    her part of the instrumentality of that

11    restraining order would be that when it was

12    issued, the state police would confiscate his

13    permit and his handguns, so that wouldn't be an

14    issue anymore.

15         Q.   Okay.

16         A.   So our goal was to get her to that

17    point.  And we discussed that.  That was where we

18    wanted to get her, so that she could feel -- so

19    she could alleviate herself of the anxiety that

20    she was feeling, okay.

21         Q.   Okay.  Did you -- before you left her

22    house, did you -- you indicated that you would

23    follow up with him.  You advised her to get a

24    restraining order.

25         A.   Yes.

1    Q.   You explained to her that that would

2    take care of -- or there would be a need for him

3    then to check his guns in or someone would take

4    them?

5              MS. FOURNIER:   Objection to the

6    form.

7    A.   He'd be required to -- the state

8    would -- I assumed the state would -- the state

9    always dealt with that part of it.

10   Q.   Okay.  So basically you explained to

11   her that a restraining order would mean his guns

12   and his gun permit would get taken away?

13   A.   Right.  He would lose all those

14   privileges through the state, so that wouldn't be

15   an issue anymore.

16   Q.   Okay.  Did you do anything else or say

17   anything else to her?  Leave a card, tell her

18   when you'd call her back, that kind of thing?

19   A.   Yes.

20   Q.   What did you do in that regard?

21   A.   I think I told her I'd call her back

22   the next morning.

23   Q.   Okay.  And then you previously

24   mentioned that you did call and you left a

25   message for him, and then you got off duty and

1    actually led me and provided it for me.  And --

2    provided the building for me that he lived in.

3        Q.    All right.

4        A.    The specific building.  So I got up to

5    the building, and then did some sleuthing around

6    there and found -- and had somebody, I don't know

7    who, that led me to his apartment door, and

8    that's when I came up with D-114.

9        Q.    You mentioned you did this on your own

10   time?

11       A.    Yes.

12       Q.    Do you do that often?

13       A.    Sometimes.

14       Q.    I mean why did you want to do it or did

15   you feel it was necessary in this case?

16       A.    Because she was a nice old lady, she

17   was a nice lady and I felt bad for her that she

18   was very anxious and I felt bad that she had to

19   be put in that situation.  And I wanted to go up

20   there and make him knock it off.  So --

21       Q.    Okay.  So I interrupted you.  You got

22   up to the apartment door.

23       A.    I knocked several times.  It was

24   obvious no one was answering.  I didn't see any

25   lights on in there.  So I left the -- my card on

1    the door, with a note.  I don't remember if it

2    was a separate note or if it was on the back of

3    my card.

4         Q.    Okay.

5         A.    I had already left voice messages, so

6    this was just -- I had hoped to catch him in

7    person, but -- so I left that, my card and the

8    note, on his door.

9         Q.    All right.

10        A.    I don't know the content of the note, I

11   can't remember, but it was something, "Call me,"

12   you know, "it's urgent that I talk to you,"

13   something to that effect.

14        Q.    So did you receive a call from him or

15   what was the next event that occurred in this

16   situation?

17        A.    The next event was I called Mrs.

18   Giaimo.  Sometime after I left the apartment, I

19   called her, looking -- I told her that I wasn't

20   able to make contact with him.  However, that we

21   discussed what the first step that she needed to

22   take was to get the restraining order.  And that

23   in the meantime, if he was to bother her, I told

24   her call me.

25        Q.    Okay.

1      A.    Because I'll take care of it.  I told

2    her, "If you call the police department, you'll

3    get a different officer, you'll have to start all

4    over again, so you're welcome to call me," and I

5    gave her my personal telephone number to call

6    me.

7      Q.    Okay.

8      A.    I said -- excuse me -- if it was

9    urgent, certainly if she was imminently in harm's

10   way, to call the police.  Due to something that,

11   you know, was informational, just to call me.

12     Q.    Did she indicate to you that she would

13   seek a restraining order?

14     A.    Uh-huh.  Yes.

15     Q.    And did -- explain to me also, this is

16   just something I don't understand, how does it

17   work internally when there's a case you've

18   investigated, you don't know whether follow-up --

19   it's possible there may be some subsequent

20   action, it's possible there may not be, how does

21   that work?  If you're not on duty 24 hours a day,

22   how does it work with respect to somebody calling

23   up with respect to a follow-up question or

24   problem normally?

25             In other words, you gave your cell

1    phone number to Miss Giaimo.  But how would that

2    work otherwise, if you didn't give her your cell

3    phone number?

4        A.    She'd have to call the police

5    department and leave a message for me.  This was

6    to bypass that in case she needed to get ahold of

7    me.

8        Q. -  Okay.  Because you had the first

9    contact with her in terms of this particular

10   situation involving she and her estranged

11   husband, does that mean you were responsible for

12   all of the follow-up that would be needed in any

13   particular situation that would happen in the

14   future, or would somebody else be responsible if

15   something else occurred?

16            MS. FOURNIER:  Objection to the

17   form.

18       A.    Actually, I believe I was the second

19   person.  I'm not obligated -- I wouldn't say I

20   was obligated.  I just -- in certain situations,

21   I'll go -- I went above and beyond what I

22   normally would do with Mrs. Giaimo.  She was a

23   nice old lady.

24       Q.    What I'm just wondering is how does it

25   work with the department when somebody calls with

1    else that you had advised her about or told her

2    about that she should do?

3        A.    At that time?

4        Q.    Yes.

5        A.    I can't recall specifically.  No.  I

6    guess just to call.  If she had a problem, to

7    call.  Like I said, if it was -- she was

8    imminently -- needed the police, to call the

9    police department, but if not, she could always

10   call me and leave a message if I wasn't -- if I

11   didn't answer, and I would call her right back as

12   soon as I got the message.

13       Q.    Okay.  Did she call again or did you

14   hear from Mr. Cosenza?  In other words, what was

15   the next thing that happened with respect to

16   this?

17       A.    I can't recall what chronologically --

18   you know, how everything came about.

19       Q.    Okay.

20       A.    I tried -- in generalities, I called

21   Frank Cosenza several times for like three days,

22   left him all sorts of messages.  I mean I didn't

23   fall off the turnip truck, I knew he wasn't

24   calling me back, he was purposely avoiding me, so

25   I was like well, I guess I'm not going to get to

1    see him in person, which happens sometimes.   And

2    I wasn't in a position, because I didn't -- I

3    didn't pursue an arrest, to actually remand him

4    into custody or anything, so I didn't need to see

5    him.

6               I left him messages that described

7    basically -- you know, that told him where I

8    stood on this, and if he was to -- you know, that

9    Mrs. Giaimo was going to -- was seeking a

10   restraining order, which would ultimately define

11   the boundaries that he had to stay within.

12   However, in the meantime, if he bothered her, I

13   was going to arrest him.

14        Q.    Okay.

15        A.    Is that was left -- I can't say

16   verbatim like that, but it was in general what I

17   told him.  And she kept -- she -- so she kept in

18   almost daily contact with me.  I can't

19   specifically say what each conversation consisted

20   of, but she kept in almost daily contact with

21   me.  Certainly right up until she got the

22   restraining order, where then we felt, you know,

23   I had -- that she was happy when she got that.

24        Q.    Okay.

25        A.    We had conversations after that too.

64

```
 1        Q.    All right.  Then I assume you didn't
 2   take any action to inquire as to whether this had
 3   indeed taken place?
 4        A.    No.  I never did.  In the past, they've
 5   always -- evidently, they were diligent about it
 6   because I never had a problem with it.  So this
 7   was something that I really was not -- not within
 8   the scope of what I've seen that we used to do at
 9   work.  Now it is for sure.  But it wasn't then.
10        Q.    When did that change?
11        A.    That changed right after this incident.
12        Q.    Okay.  Tell me how that changed.  Was
13   there a department policy change in writing?
14        A.    I believe there was a policy directive,
15   and it also became public -- through a public act
16   it became a statute, I guess.
17        Q.    All right.  Is there a procedure now
18   then that you must follow that is different from
19   prior to Mrs. Giaimo's murder?
20        A.    Departmentally, we function differently
21   regarding these types of incidents.
22        Q.    Okay.  How do you --
23        A.    I don't function much differently.  At
24   the time, I mean I -- if someone is imminently in
25   harm's way, we have always taken guns from
```

1    people.  I mean it's not like we have to wait for

2    a restraining order to come out.

3         Q.   Okay.

4         A.   But now, when the restraining order is

5    issued, we have department personnel that

6    actually track it and physically go confiscate it

7    if they're not -- if they're not turned in

8    voluntarily.

9         Q.   Okay.

10        A.   At that time, departmentally we didn't

11   function -- we weren't -- I don't believe

12   anyone -- that we were even aware that this was

13   our responsibility.

14        Q.   Okay.

15        A.   I mean he didn't even live in town,

16   so --

17        Q.   Okay.  Why don't you tell me -- after

18   she obtained the restraining order up until the

19   time she was murdered, which would be on July

20   20th, did you have other conversations with her?

21        A.   Several conversations.

22        Q.   Why don't you tell me the next time you

23   spoke with her chronologically, using those

24   boundaries.  The restraining order, forward.

25        A.   See, I can't recall specifically the

1    content and the -- and chronologically or the

2    actual time parameters of when I spoke to her.

3    In general, I had several conversations with

4    her.  Is it the 6th to -- from the 6th to the

5    12th or to the 13th, he got arrested on the 13th

6    I think or something.  He -- about a week after,

7    he got arrested.

8         Q. ¯  Okay.

9         A.    So in that time.

10        Q.    Would you be referring to the 12th,

11   would that sound about right?

12        A.    About a week later after the

13   restraining order.  She felt better when she got

14   the restraining order.  I felt better.

15        Q.    Okay.

16        A.    I told her now we have the instrument

17   to arrest this gentleman if he crosses these

18   boundaries listed in this order.  But you have to

19   call us.

20        Q.    Okay.

21        A.    If you don't call us, nothing -- he's

22   going to feel empowered and he's going to push it

23   more and he's going to push and see how far he

24   can go.  So as soon as he even remotely comes

25   close, as soon as he gets right over the line,

67

1    call the police.  You got to do it every time,

2    you have to be consistent or he's going to take

3    advantage of you.

4        Q.    Do you think she understood what you

5    were saying?

6        A.    She knew what I was saying, yeah.

7        Q.    Prior to the time you had that

8    conversation, had she been compliant with all

9    your directives, listen to you and follow your

10   directions?

11       A.    Pretty much so, yes.  I didn't really

12   give her like a lot of directives.  We discussed

13   it and came to a lot of conclusions.  She

14   understood it.  She didn't know the system real

15   well but she knew and she had -- she knew it and

16   we discussed it.  She had a problem because she

17   was passive, you know, and she didn't want to

18   assert herself and I was trying to egg her on,

19   you know, prod her into asserting herself, or I

20   couldn't help her a real lot unless she did.

21       Q.    Okay.  So what happened between the 6th

22   and the 12th?

23       A.    We had -- I wouldn't say it was daily,

24   but even if it was several times within the

25   period, three or four times within that period,

1    state.

2        Q.    Okay.   So after he was arrested, did

3    you then speak with Mrs. Giaimo the next day?

4        A.    The next morning.

5        Q.    Okay.

6        A.    She -- her and her daughter came to the

7    police department early in the morning.

8        Q.    Okay.

9        A.    And I met them out in the front foyer

10   of the police department.

11       Q.    Okay.   Did her daughter say anything to

12   you at that time?

13       A.    I -- probably, but I don't remember.

14       Q.    Okay.   What did Miss Giaimo say to you

15   in that conversation?

16       A.    I don't remember.   We did -- the three

17   of us spoke out in the foyer.   I don't remember

18   what the -- I know she was upset.

19       Q.    Okay.

20       A.    But I just don't remember the words

21   that were exchanged.   But we did -- the three of

22   us did talk.

23       Q.    Okay.   And when did you speak with her

24   next?

25       A.    I spoke to her about midday, about noon

1  or so, maybe a little before that, maybe like

2  between 10:30 and noon that same day.

3      Q.  Okay.  And what was the purpose of that

4  conversation?

5      A.  Well, I actually spoke to her and her

6  daughter separately.  I went -- it was to inform

7  them that I had made a trip.  When I got off from

8  work, I drove down to New Haven to the

9  courthouse, to speak to the victim's advocate

10  regarding their anticipated encounter with Mr.

11  Cosenza that morning.

12      Q.  Okay.  Was this again something you did

13  on your own time or was this something that --

14      A.  No.  I did it on my own time.

15      Q.  And what was your purpose in doing

16  that?  What did you feel she needed to know?

17      A.  Well, after seeing her that morning,

18  she was pretty upset.  And I knew he was -- he

19  was pushing the envelope, and I knew that -- my

20  intuition and my experience told me that he was

21  going to go in there like the doting old

22  grandfather, and they were just going to scoot

23  him out the door, and he was going to feel

24  empowered to -- even more so, to bother her.

25      Q.  Okay.

1        A.    So I went down to try to put a monkey

2   wrench in that.

3        Q.    Do you remember who you spoke to?

4        A.    I don't know her last name.  Her name

5   was Robin.

6        Q.    Okay.  And what did she look like?

7        A.    I believe -- I think she was like

8   lighter-haired, blond, blond or light brown.

9   Dirty blond or something.  I don't remember.

10       Q.    Okay.  Did you speak with anybody else

11  that day at the courthouse?

12       A.    I probably did.  I don't know about

13  this incident though.  I'm sure I spoke to other

14  people through the courthouse, yeah.  But

15  specifically with her about what was going on

16  with this.

17       Q.    Okay.  Is that unusual for you to go to

18  the courthouse?

19       A.    Yes.

20       Q.    Okay.  Was this the only time you had

21  done something like that?

22       A.    No.

23       Q.    Okay.  Tell me what next -- the next

24  involvement you had with either Miss Giaimo or

25  the court or Mr. Cosenza.  Did you ever end up

1  seeing him face-to-face, by the way?

2      A.    No.

3      Q.    Okay.

4      A.    What was the question again?

5      Q.    Tell me just the next involvement that

6  you had with any of the individuals you mentioned

7  or the situation in general.

8      A.    The victim's advocate -- you know, I

9  expressed my feelings that he was going to come

10  in there and, you know, knowing how the system

11  works and that he is an elderly guy, they're not

12  going to want to lock him up for sure, I didn't

13  expect that they would lock him up, but that

14  somehow I needed assistance, just sending him a

15  message so that he doesn't feel that he can go

16  unfettered, and -- you know, because of his age

17  and fall back on that.  And she assured me that,

18  "We'll take care of him, and he'll -- we don't

19  care how old he is, we'll take care of this."

20      Q.    Okay.  So after that, what was your

21  next encounter or involvement?

22      A.    I talked to -- called up Mrs. Giaimo,

23  on my way home, from my cell phone.

24      Q.    What did you tell her?

25      A.    I told her I went down to the victim's