# EXHIBIT J

## AFFIDAVIT

1. I, Frank T. Baldo, am over the age of eighteen and I believe in the meaning and obligations of an oath.

2. I am a State Marshall (formerly referred to as a Deputy Sheriff) in New Haven County and I have held this position for approximately fifteen years.

3. I served the original Summons and Complaint for Dissolution of Marriage on Frank Cosenza when he was living with Josephine Giaimo in East Haven. I recall having a conversation with Mr. Cosenza at that time.

4. I remembered Mr. Cosenza when I received papers that I was to serve on Frank Cosenza relating to a restraining order dated July 6, 2000.

5. I arranged to meet Frank Cosenza outside of his apartment building in New Haven on July 7, 2000.

6. Frank Cosenza sat with me in my car for approximately twenty minutes on July 7, 2000 when I served the restraining order papers.

7. The papers that I served consisted of copies of four pages, or three pages with one page consisting of two sides, and included the affidavit of Josephine Giaimo, which is attached to my affidavit and initialed by me. I have also referred to this affidavit as the "complaint" of Josephine Giaimo.

8. During the period of approximately twenty minutes that I spent with Frank Cosenza on July 7, 2000, I specifically pointed out the notice within the restraining order concerning firearms to Cosenza because I had read about the pistol permit and death threats in Josephine Giaimo's affidavit.

9. I also told Cosenza that it was my understanding that he had a gun. Frank Cosenza responded to my comment by saying that he owns two handguns and both were in a box in his apartment. I again told Cosenza of the requirement to surrender or transfer these guns.

10. I then drove to the East Haven Police Department where I served Officer Mike D'Amato with copies of the same four pages, or three pages with one page consisting of two sides, that I had just served on Frank Cosenza. These four pages included the affidavit of Josephine Giaimo. These pages are attached to my affidavit.

11. I told Officer O'Amato "this guy has guns", or something to that effect. Officer O' Amato did not ask for any further information after I told him that Frank Cosenza had guns.

12. On the morning of July 27, 2000, Sergeant Scobie of the East Haven Police Department asked me to come to the East Haven Police Department to discuss a matter with him. I went to the East Haven Police Department in the early afternoon of July 27, 2000 and met with Sergeant Scobie who was in plain clothes. Sergeant Scobie opened a folder and showed me three pages of text and asked me to confirm that I served these papers at the East Haven Police Department on July 7, 2000. Only one of the three pages was a document that I served at the East Haven Police Department on July 7, 2000. The other two pages were related to a protective order that I was not involved with. I told Sergeant Scobie that I served four pages in my service of a restraining order, including a page that I referred to as the "complaint" of Josephine Giaimo. I don't recall if I received three pages with text on the reverse of one page or four separate papers for service. I told Sergeant Scobie that I was certain that I served four pages, or three pages with text on two sides of one page, on each recipient because I charged for eight copies in my bill for services. Sergeant Scobie did not take notes in my presence and did not ask me to sign anything. To the best of my recollection, this meeting lasted between five to seven minutes.

13. In August of 2000, I gave a statement and affidavit similar to this affidavit the Victim's Advocate.

14. Some time after that affidavit was given, I was again requested to meet with Sergeant Scobie. I brought my file regarding this matter, which contained all relevant copies of paperwork including the papers I served and the business card of Officer D'Amato.

I have read this two-page affidavit and it is the truth to the best of my recollection.

Frank T. Baldo

Subscribed and sworn to before me on this 19th day May, 2004

JOBY M. FARRELL
*NOTARY PUBLIC*
MY COMMISSION EXPIRES MAY 31, 2006

**AFFIDAVIT-**
**RELIEF FROM ABUSE**

JD-FM-138  Rev. 8-95
C.G.S. §§ 46b-15, 52-231a, P.B. § 476

STATE OF CONNECTICUT
SUPERIOR COURT

**INSTRUCTIONS TO APPLICANT** *(Affiant)*

*This affidavit must be completed and given to the clerk along with your completed Application for Relief From Abuse, form JD-FM-137. Your affidavit must include a statement of the conditions from which you seek relief and must be made under oath. The statement must be true to the best of your knowledge. Give recent, specific examples along with dates and state if any arrest was made related to the incidents outlined in this statement.*

*If you seek temporary custody of your minor child(ren), you must also state that to the best of your knowledge no other proceeding is pending concerning the custody of such children or, if such a proceeding is pending, you must detail the nature of the proceeding and state the decree of the court will not conflict with or interfere with such other proceeding.*

| NAME OF APPLICANT *(Your name)* | NAME OF RESPONDENT *(Person against whom application is filed)* | DOCKET NO. *(For court use only)* |
|---|---|---|
| Josephine T. Giaimo | Frank Cosenza | 438730 |

I, the undersigned, duly depose and say that I am the Applicant in this matter and state as follows:

## STATEMENT OF CONDITIONS FROM WHICH YOU SEEK RELIEF

Wherever I go, Frank Cosenza, my husband, (against whom I have started a dissolution action) follows me on an almost daily basis. This includes when I go to Church, the Senior Center in East Haven, meetings at St. Boniface Church in New Haven and on my walks.

Frank Cosenza has left phone messages and in person has threatened my life on several occasions. As a result, I have contacted the East Haven Police Department on several occasions. Frank Cosenza has a gun permit. Frank Cosenza told me if I ever call the Police again he will kill me.

Frank Cosenza recently came to my house around 10:00 P.M. and looked through a window and scared me. He has also cursed me. He also continuously drives by my house to harass me.

As a result of all the above, I have become extremely nervous, endured headaches and an upset stomach and been obligated to take medications. I have also had to have my phone number changed to an unlisted number.

## STATEMENT CONCERNING TEMPORARY CUSTODY OF CHILDREN

If you seek temporary custody of your minor child(ren), "X" one of the following:

☐ To the best of my knowledge no other proceeding is pending concerning the custody of my minor child(ren).

☐ There is another proceeding pending concerning the custody of my minor (child)ren. (Detail below the nature of the proceeding and state whether to the best of your knowledge an order of this court will conflict with or interfere with such other proceeding.)

| I hereby certify that the foregoing statements are true to the best of my knowledge and belief | SIGNED *(Applicant/Affiant)* Josephine T. Giaimo Josephine T. Giaimo | DATE SIGNED July 6, 2000 |
|---|---|---|
| Subscribed and sworn to before me: | SIGNED *(Clerk, Notary, Comm. Sup. Ct.)* | DATE SIGNED July 6, 2000 |

Theodore G. Fretel, Comm. Sup. Ct.

DISTRIBUTION: White and pink copy to the Court, yellow copy to Applicant

# EXHIBIT K

1

```
 1    IN THE UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF CONNECTICUT

 3

 4

 5    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 6    SANDRA SMITH, As Executrix of
      the Estate of Josephine Giaimo, :

 7
                          Plaintiff,        _:
 8                                              Civil Action
            -versus-                        :  No. 3:01 CV 1375
 9                                              (AHN)
      TOWN OF EAST HAVEN,                    :
10    Individual Officers:
      Mike D'Amato, Badge #0430;            :
11    David Torello, Badge #1750;
      John Cascio, Badge #0310;             :
12    Lisa Scaramella, Badge #1580;
      and Kevin McCarthy, Badge #1080,:
13
                          Defendants.       :
14
      - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
15

16

17                    Deposition of MICHAEL D'AMATO,

18         taken pursuant to the Federal Rules of Civil

19         Procedure, at the law offices of Jacobs,

20         Grudberg, Belt & Dow, P.C., 350 Orange

21         Street, New Haven, Connecticut, before James

22         A. Martone, L.S.R. #00248, a Notary Public

23         in and for the State of Connecticut, on

24         February 6, 2003, at 2:16 p.m.

25
```

1     Q.   Okay.  Do you remember anything about
2    the encounter that you had with him that day?
3          A.   He was in his regular clothes.  He
4    wasn't like in any uniform or anything.
5          Q.   Okay.
6          A.   And I think he was -- I think he was
7    balding.  I'm not sure.  I -- I wouldn't know if
8    he walked in right now.  I'd never know.
9          Q.   Okay.  White guy, black guy?
10         A.   He was white.
11         Q.   Okay.  So tell me about the whole
12   encounter.  Any conversations you had --
13         A.   With the sheriff?
14         Q.   Yes.
15         A.   I was dispatching, sitting down in the
16   chair, and I noticed the gentleman standing at
17   the window.  And I went up and asked him if I
18   could help him and he said he was Sheriff Baldo,
19   and I'm not sure if he showed me a badge or ID,
20   they usually do.  I can't recall if he did or
21   not.
22         Q.   Okay.
23         A.   And he had paperwork in his hand and he
24   said, "I just served a gentleman with some
25   paperwork and I'm here to give you a copy of

1    it." And he slid it under the window. We have a

2    little slot like that and he slid it under to

3    me. And as -- I picked it up and was glancing

4    over it. It could be divorce paperwork, you

5    know, it could be a subpoena. I was just trying

6    to eyeball what the heading was, and as I was

7    looking at it, he said, "I think this guy has

8    guns."

9         Q.    Okay.

10        A.    And I said, "Okay." And he said --

11   that's about it. He just turned around and

12   started walking away. Then he turned around and

13   said, "Oh, one second, can I get your name or a

14   business card?" And I said, "Okay." So I gave

15   him one of my business cards. He said he just

16   needed it to show who he served. I gave him the

17   business card and he turned around and walked

18   away.

19        Q.    Did you prepare any report indicating

20   this guy, that he reported this guy has guns?

21        A.    No.

22        Q.    Okay. What did you do with that

23   information?

24        A.    I turned around, I went to my

25   supervisor, Sergeant Alves, in the same room, and

# EXHIBIT L

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF CONNECTICUT

3

4

5    --------------------------------x

6    SANDRA SMITH, As Executrix of
     the Estate of Josephine Giaimo, :
7
                    Plaintiff,        :
8                                         Civil Action
           -versus-                   : No. 3:01 CV 1375
9                                         (AHN)
     TOWN OF EAST HAVEN,              :
10   Individual Officers:
     Mike D'Amato, Badge #0430;      :
11   David Torello, Badge #1750;
     John Cascio, Badge #0310;       :
12   Lisa Scaramella, Badge #1580;
     and Kevin McCarthy, Badge #1080,:
13
                    Defendants.       :
14
     --------------------------------x
15

16

17              Deposition of DAVID TORELLO,

18       taken pursuant to the Federal Rules of Civil

19       Procedure, at the law offices of Jacobs,

20       Grudberg, Belt & Dow, P.C., 350 Orange

21       Street, New Haven, Connecticut, before James

22       A. Martone, L.S.R. #00248, a Notary Public

23       in and for the State of Connecticut, on

24       February 6, 2003, at 12:23 p.m.

25

1    received, did you receive any other information

2    from Miss Giaimo with respect to the situation

3    between herself and Frank Cosenza?

4                MS. FOURNIER:  Objection to the

5    form.

6        A.    No.

7        Q.    Did the woman that she was with provide

8    any additional information?

9        A.    No.

10       Q.    Okay.  Did you ask her any other

11   questions, other than what you've previously

12   testified to?

13       A.    I asked her at the end of the statement

14   or right before the end of the statement, after

15   the second incident, if she was scared of him,

16   and she said yes.

17       Q.    Okay.  Did you ask her any additional

18   questions with respect to the history between the

19   two?

20       A.    No.

21       Q.    Okay.  And then did you ask her to give

22   a statement?

23       A.    Yes.

24       Q.    Okay.  And was that given at her house

25   at that time?  In other words, did you ask her to

1    write it out at that point in time or did she

2    write it out later?

3        A.    I wrote it out in her words.

4        Q.    Okay.

5        A.    And it was at that time.

6        Q.    Okay.    There's a question at the end of

7    the statement, "Do you want Frank arrested for

8    violating the court order?"   And the answer is

9    "Yes."

10               Does a complaining victim in this

11   type of situation have a choice as to whether a

12   person should be arrested?

13       A.    No.

14       Q.    Okay.   And so what action did you take

15   next with respect to this incident?

16       A.    Okay.    I advised her that I would try

17   to get him arrested -- I would arrest him that

18   night, if at all possible.

19       Q.    Okay.

20       A.    And if not, I would need to do a

21   warrant.   She gave me his cell phone number.   I

22   believe it was his cell phone number.   I'm pretty

23   sure it was his cell phone number.

24       Q.    Okay.

25       A.    And advised her that I would attempt to

1    make contact with him and try to get him to at

2    least turn himself in.

3         Q.    Okay.  And did that happen?

4         A.    Shortly afterwards, I made a call to

5    Frank Cosenza and advised him of the complaint

6    that Josephine put against him.

7         Q.    Okay.

8         A. -  And I advised him to turn himself in.

9    And short time after that, I don't know how long,

10   he did turn himself in.

11        Q.    Okay.  I notice in your report you

12   indicate he was arrested for breach of peace

13   under the family violence statute, or a portion

14   of that statute.  And is that a charge that you

15   decided?  In other words --  Let me withdraw

16   that.

17              In any given case, when you're

18   making an arrest, do you decide the charges that

19   are appropriate?

20        A.    Usually.

21        Q.    Okay.  Okay.  What happens in an

22   unusual situation, just so I understand?

23        A.    I'd speak with a supervisor and confer

24   with him, or brother and sister officers --

25        Q.    Okay.

```
 1        A.   -- to find out what charge would be
 2   best.  But most times, it's the supervisor.
 3        Q.   Okay.  So if I understand the process
 4   correctly, what you do is you interview somebody,
 5   get information about a particular situation, do
 6   any additional investigation that you feel is
 7   appropriate, and then you see if there's probable
 8   cause for an arrest?
 9             MS. FOURNIER:  Objection to the
10   form.
11        Q.   And then in situations where you're
12   perhaps unsure or uncertain, you have a
13   supervisor available or brother or sister
14   officers?
15             MS. FOURNIER:  Objection to the
16   form.
17        A.   Can you repeat that?
18             MS. PAINE:  Let me have it read
19   back.
20             (Question read.)
21             MS. FOURNIER:  Same objection.
22        A.   Yes.
23        Q.   And under the circumstances, if you are
24   either seeking some confirmation of what you've
25   done, want it reviewed by either a supervisor or
```

32

1      a fellow officer, you can do that as well?

2          A.    Yes.

3          Q.    But that's not required?

4          A.    No.

5          Q.    Okay.  I notice in your report there's

6      an indication, under the offense box -- and if

7      you want to refer to your report, that's fine --

8      "family violence" and "breach of peace."

9          A.    Yes.

10         Q.    Were those two separate charges, to

11     your knowledge, or was that one charge?

12         A.    No.  Family violence is not an actual

13     charge.

14         Q.    Okay.

15         A.    Offenses and charges are -- as far as

16     our department, they're different.

17         Q.    Okay.  So Mr. Cosenza was charged with

18     one count of breach of peace under the family

19     violence section; is that right?

20         A.    Yes.

21         Q.    Okay.

22         A.    The offense he was charged with is

23     lower in the report.

24         Q.    Okay.  And did you make a determination

25     why he would be charged with one count versus two

1    that would come in, all the arrestees.

2        Q.    Okay.

3        A.    And so he went through the booking

4    process.  And at some point during that time --

5    like I said earlier, I'm not sure if it was on

6    the phone or in the station that I actually

7    talked to him.  It must have been -- it could

8    have been both times.  That I might have said the

9    same thing both times, just to reiterate the

10   complaint against him --

11       Q.    All right.

12       A.    -- from Mrs. Giaimo.

13       Q.    All right.

14       A.    And at some point during that, I know

15   my shift supervisor, Lieutenant D'Costa, he had

16   spoke at least briefly with Mr. Cosenza.

17       Q.    All right.  Was that in your presence

18   or out of your presence?

19       A.    I don't know what exactly -- it was

20   obviously out of -- I mean at least out of

21   earshot, at least where I wasn't listening to the

22   conversation.

23       Q.    Okay.  Do you know what was said?

24       A.    No.

25       Q.    Okay.

43

1          A.    Lieutenant D'Costa, at one point he

2    handed me the gun permit that -- Frank Cosenza's

3    gun permit, and advised me that I would need to

4    send it to the state because we were confiscating

5    it.  And so I did take that, the gun permit.  And

6    eventually that night, I -- I'm not sure exactly

7    how I did it, but it was eventually given to our

8    records division to send up to the state.

9          Q.    Okay.  Was there a note -- was it

10   Lieutenant D'Costa?

11         A.    Yes.

12         Q.    Did you make any mention of his

13   interaction in your police report?

14         A.    Lieutenant D'Costa's interaction?

15         Q.    Yes, about him giving you the permit or

16   anything?

17         A.    No.

18         Q.    Okay.  So did you subsequently send

19   that up to the state?

20         A.    Yes.

21         Q.    Okay.

22         A.    Our records did.  I didn't.  Our

23   records department did.

24         Q.    Was it up to you to determine the

25   amount of bail in this case or is that somebody

44

1    else's determination?

2        A.    My lieutenant's.

3        Q.    Okay.  And did you have any further

4    conversation with Mr. Cosenza, other than what

5    you've already told us about?

6        A.    I don't believe so.  I don't believe I

7    did.

8        Q. - Did you make any further inquiry of him

9    with respect to whether he actually had guns or

10   other weapons?

11       A.    No.

12       Q.    Okay.  And did you have any further

13   contact with either Miss Giaimo or Mr. Cosenza or

14   this case from your involvement -- from the end

15   of your involvement that you just testified to

16   through to the time you learned she was killed?

17       A.    Mrs. Giaimo, I gave her a phone call,

18   once Frank was arrested --

19       Q.    Okay.

20       A.    -- to advise her that he was

21   arrested --

22       Q.    Okay.

23       A.    -- because of a family violence crime.

24       Q.    Is that required, that you notify the

25   complaining victim?