# EXHIBIT AA

# State of Connecticut

*Office of the*

# Victim Advocate

James F. Papillo, Victim Advocate



# INDEPENDENT INVESTIGATIVE REPORT



## MURDER OF JOSEPHINE GIAIMO
East Haven, Connecticut
July 20, 2000

## OCTOBER 16, 2000

EXHIBIT 11
(page 1 of 1)

## AFFIDAVIT

1. I, _____, am over the age of eighteen and I believe in the meaning and obligations of an oath.

2. I am a daughter of Josephine Giaimo and I enjoyed a very close relationship with my mother.

3. My mother, Josephine Giaimo, first told me that Frank Cosenza had three guns in their home on _____ in East Haven when I was visiting my mother at her home. My mother told me that Cosenza kept guns for protection and sometimes carried one when he went to dangerous areas.

4. I spoke to my mother about Frank Cosenza's guns on several other occasions and she said that she was afraid of these guns, especially after filing for a divorce and, again, after obtaining a restraining order.

5. My mother told me that Frank Cosenza kept his three guns in their bedroom when they lived together on _____ in East Haven. My mother also told me that Cosenza took these three guns with him when he moved to New Haven from my mother's East Haven home.

I have read this one-page affidavit and it is the truth to the best of my recollection.

Subscribed and sworn to before me on this 7th day of September, 2000.

_____
Michael J. Lefebvre, Esq.
Commissioner of the Superior Court

# EXHIBIT BB

**State of Connecticut**

*Office of the*

# Victim Advocate

James F. Papillo, Victim Advocate



# INDEPENDENT INVESTIGATIVE REPORT



## MURDER OF JOSEPHINE GIAIMO
East Haven, Connecticut
July 20, 2000

### OCTOBER 16, 2000

**EXHIBIT 12**
(page 1 of 1)

## AFFIDAVIT

1. I, _____ am over the age of eighteen and I believe in the meaning and obligations of an oath.

2. I am an attorney in Connecticut and my office is in North Branford.

3. I represented Josephine T. Giaimo and filed a dissolution action on her behalf dated May 15, 2000 returnable to the New Haven Superior Court on June 6, 2000. At a meeting at my office on May 15, 2000, attended by Josephine T. Giaimo and her daughter-in-law, _____ Josephine T. Giaimo informed me that her husband, Frank Cosenza, had guns.

4. On July 6, 2000, I prepared an Affidavit for Josephine T. Giaimo on a Superior Court form entitled "Affidavit-Relief from Abuse". This Affidavit was signed by Josephine T. Giaimo and submitted to the New Haven Superior Court with an Application for Relief From Abuse.

5. I prepared the above-referenced Affidavit and Application for Application For Relief From Abuse after Josephine T. Giaimo informed me that Frank Cosenza had been following and harassing her, and had, on several occasions, threatened to kill her.

6. I filed the above-referenced Affidavit and Application for Relief From Abuse at the New Haven Superior Court on that same date, July 6, 2000, and the Court issued ex parte restraining orders on that date.

7. I then promptly arranged to make service of the appropriate papers by New Haven County Deputy Sheriff.

I have read this one-page Affidavit and it is the truth to the best of my recollection.

Subscribed and sworn to before me on this 7th day of September, 2000.

_____
Michael J. Lefebvre, Esq.
Commissioner of the Superior Court

# EXHIBIT CC

1

```
 1    UNITED STATES DISTRICT COURT

 2    DISTRICT OF CONNECTICUT

 3

 4

 5    -------------------------x

 6    SANDRA SMITH, as
      Executrix of the Estate
      of Josephine Giaimo,        :

 7
                    Plaintiffs,  :
 8
           -versus-             : No. 3:01 CV 1375(AHN)
 9
      TOWN OF EAST HAVEN,
10    Individual Officers:  Mike
      D'Amato, Badge #0430;
11    David Torello, Badge
      #1750; John Cascio, Badge
12    #0310; Lisa Scaramella,
      Badge #1580; and Kevin
13    McCarthy, Badge #1080,    :

14                  Defendants.  :

15    -------------------------x

16

17                  Deposition of BRUCE SCOBIE, taken

18    pursuant to Federal Rules of Civil Procedure, at the

19    law offices of Jacobs, Gruderg, Belt & Dow, P.C., New

20    Haven, Connecticut, before Jacqueline McCauley,

21    RPR/CSR, a Notary Public in and for the State of

22    Connecticut, on September 24, 2003, at 11:30 a.m.

23

24

25
```

1    **A P P E A R A N C E S:**

2              For the Plaintiffs:

3         JACOBS, GRUDBERG, BELT & DOW, P.C.
          350 Orange Street
4         New Haven, Connecticut 06503
          By:  ROSEMARIE PAINE, Esq.
5

6
              For the Defendants:
7
          LYNCH, TRAUB, KEEFE & ERRANTE
8         52 Trumbull Street
          New Haven, Connecticut 06510
9         By:  NICOLE M. FOURNIER, Esq.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          Q.   So after several days a determination was

3    made that it was a murder suicide and the case could

4    be closed; is that right?

5          A.   The Medical Examiner's office would

6    document or classify the manner of death and once we

7    received official notification from the Medical

8    Examiner's office then that's what it would be

9    classified as and closed.

10         Q.   Can you look at the paperwork that you

11   have that we've marked as Exhibit 2 and tell me when

12   you received that notification?

13         A.   I don't believe -- it's not listed here.

14         Q.   Would that mean that there's a portion of

15   your file that -- withdrawn.  Would that be something

16   that you would keep in your file?

17         A.   Yes.

18         Q.   Is it fair to assume then that there may

19   be a portion of your file that's missing?

20              MS. FOURNIER:   Objection to the

21   form.

22         Q.   From Exhibit 2.

23         A.   Exhibit 2 is evidence, an evidence

24   collection list.

25         Q.   Actually let me just interrupt you for a

1    second.   This is all Exhibit 2 collectively.

2            A.   Oh okay.   My report states that the

3    Medical Examiner's office did classify it as a murder

4    suicide and I wrote that on the 4th of September.   So

5    that would have been about the time we were notified.

6            Q.   Okay.   And would that have been about the

7    time you closed the file then?

8            A.   Yes.

9            Q.   With respect to Ms. Giaimo and the

10   circumstances rounding her murder, were you ever given

11   any other assignments with respect to investigation?

12   In other words, were there any other assignments

13   relating to her murder other than the murder

14   investigation?

15           A.   No.

16           Q.   Did you have any discussions -- you

17   previously mentioned as a part of your investigation

18   you interviewed witnesses and we talked about that.

19   You reviewed reports and we've discussed that.   Did

20   you speak to anybody else with respect to the

21   investigation either your superiors or other East

22   Haven police officers?

23                   MS. FOURNIER:   Objection to the

24   form.

25           A.   I'm sure I did during the course of the

1   investigation.

2           Q.   Can you tell me who you spoke to?

3           A.   Well, I would have spoken to the chief.

4   I'm sure he would have wanted to know what was going

5   on.  Probably the captain and the officers on the

6   green that night probably.

7           Q.   Who was the captain that you are referring

8   to?

9           A.   Gallo.

10          Q.   Why don't we first start with the chief?

11  Can you please tell me when you spoke to him?

12          A.   I would have been in contact with him

13  through the course of the investigation.

14          Q.   And what did you tell him and what did he

15  tell you?

16          A.   Well, I told him what we had on that night

17  on the green and then we had requested assistance from

18  the State Police for evidence collection and he would

19  want to be kept informed through the course of the

20  investigation what was going on.

21          Q.   Do you recall anything specific you may

22  have told him about the investigation?

23          A.   Not specifically.

24          Q.   Do you recall anything he specifically

25  would have told you with respect to the investigation.

1   report, through Plaintiff's 2 rather and tell me who

2   else you spoke to?

3        A.   There's several young people listed here

4   in the report listed as witnesses that were on the

5   green that night.  I know there weren't statements

6   taken from them, but I probably spoke to them on the

7   green that night.  There is a statement taken from

8   Sheriff Baldo.

9        Q.   Can you tell me when that statement was

10  taken?

11       A.   October 17, 2000.

12       Q.   And what was your purpose in speaking to

13  Mr. Baldo?

14       A.   To determine the motions he filed in

15  delivering a restraining order to the East Haven

16  Police Department.

17       Q.   And what was your purpose in finding out

18  that information?

19       A.   There was a question at that time whether

20  the entire restraining order was left with our

21  department or not.

22       Q.   And did Mr. -- you took a written

23  statement from him?

24       A.   Yes, I did.

25       Q.   And I didn't ask you this with respect to

1    the other witnesses, but can you just go through your

2    procedure in taking a written statement?  In other

3    words, you previously testified you interviewed people

4    and eventually there is a written statement.  Just

5    give me the --

6            A.    These statements were not going to be used

7    in a criminal, in the criminal original so there would

8    be no rights read or anything like that.  I would

9    advise the person I was taking the statement for

10   informational purposes and if they were agreeable to

11   give me a statement, there is a brief disclosure on

12   the top of the statement that's read in my presence

13   and the statement is taken.

14           Q.    And when did you first speak with

15   Mr. Baldo?

16           A.    The statement was taken on the 17th.

17           Q.    Is that when you first spoke with him?

18           A.    I believe I spoke to him once prior.

19           Q.    And when was that?

20           A.    It was shortly after the shooting.

21           Q.    And what was your purpose in speaking to

22   him then?

23           A.    Same purpose.

24           Q.    And when you say shortly after the

25   shooting, are you talking about July of 2000?

1    your investigation, correct?

2         A.   Not to  -- not the delivery of the

3    restraining order, no.   That's pretty common.

4         Q.   Okay.   So I'm confused.   It appears in

5    your report.   Why did you then take a statement from

6    him?

7                   MS. FOURNIER:   Objection to the

8    form.   I think that's a mischaracterization.

9         Q.   Tell me why you took the statement from

10   him.

11        A.   I took the statement, because there was a

12   question on whether or not the entire restraining

13   order was left with our department.

14        Q.   Okay.   So why did you take the statement

15   at the time you took the statement in October?

16        A.   To ask him whether or not, whether he

17   remembered whether or not he had dropped the entire

18   restraining order off or what he did.

19        Q.   And I take it from your previous testimony

20   that he gave you the same answer in July or late, or

21   early August, correct?

22        A.   Correct.

23        Q.   And why didn't you take a written

24   statement from him at that time?

25        A.   Didn't think it was needed.

1          A.    July or early August.

2          Q.    Is there any mention in any of your police

3     reports about having spoken to him in July or early

4     August?

5          A.    I don't know without reading it.

6          Q.    Would you like to review them and then

7     answer that question?

8          A.    This is just in my report?

9          Q.    Well, to your knowledge is there any,

10    would there be any other report generated if you

11    interviewed a witness?

12         A.    No. No.  There is no mention of it in my

13    report.

14         Q.    So if I understand you correctly, you

15    would have spoken with him at that time and not made

16    any written notation that you had spoken to him?

17         A.    That's possible.

18         Q.    And what did Mr. Baldo tell you when you

19    first spoke with him in July or early August?

20         A.    He told me the same thing he told me when

21    I took the statement.  That he served a restraining

22    order on Mr. Coscenza in his capacity as a sheriff and

23    that he left a copy of it with our department.

24         Q.    Okay.  And that was something that you

25    felt was important enough to document as a part of

1          Q.   And why did you then think it was needed
2     in October?
3          A.   Because there was a question on whether or
4     not the entire order was dropped off.
5          Q.   So you're saying that back in August, when
6     you interviewed him, there wasn't that question in
7     July or early August?
8          A.   I don't know if the question come about
9     then or not.  I think it was being looked into at that
10    time.
11         Q.   And who was looking into it?
12         A.   I believe the record room.
13         Q.   And why was the record room looking into
14    it?
15         A.   Because there was a question on whether or
16    not -- there was a discrepancy on whether or not the
17    sheriff dropped off the entire restraining order or
18    not.
19         Q.   And specifically what was the question
20    with respect to the restraining order?
21         A.   Whether or not the application for the
22    order was left with it.
23         Q.   And what would be the importance of that
24    as you understood it?
25         A.   The importance?  It wouldn't be important

1   as far as the investigation went or the outcome of the

2   investigation.  It was more of a record keeping

3   function at that time.  There was a claim that there

4   was a copy of something left at the department that

5   the department didn't have.

6          Q.   Okay.  Who asked you to investigate that

7   particular aspect of the case?

8          A.   I don't think anybody specifically asked

9   me to.  I think it just came about during the

10  investigation.  The question came up.

11         Q.   Okay.  So how did the question come up

12  that led you to perform that aspect of an

13  investigation?

14         A.   Well, the sheriff said that he had dropped

15  off the entire restraining order and it wasn't

16  available.

17         Q.   How did you determine it wasn't available?

18         A.   I looked in the filing cabinet that holds

19  the restraining orders.

20         Q.   What did you find in that filing cabinet?

21         A.   There was a restraining order there, not

22  the application for the restraining order.

23         Q.   And what did you do when you found out

24  that that was missing?

25         A.   Well, I didn't think it was missing.  It's

```
 1    not normal to have that.

 2              Q.   Why isn't it normal to have it?

 3              A.   It's usually not left by the sheriff.

 4    It's for the part of the restraining order.

 5              Q.   And what additional information did the

 6    restraining order application in this case contain?

 7                        MS. FOURNIER:   Objection to the

 8    form.

 9              A.   There would be no different information.

10    I don't understand what you mean by different.

11              Q.   Well, you previously testified that the

12    application was attached according to Mr. Baldo.

13              A.   Yes.

14              Q.   And you did not find it.

15              A.   Right.

16              Q.   Did you know what information that

17    application contained?

18              A.   No.   It wasn't there.

19              Q.   And so how did you come to contact

20    Mr. Baldo?

21              A.   I believe I called him on the phone.

22              Q.   And what happened?   Tell me about that

23    conversation.

24              A.   I asked him to stop at the police

25    department and I wanted to speak to him and he did.
```

1          Q.   And what did he tell you?

2          A.   He told me that he had left the

3    application for the restraining order with the

4    restraining order at the front desk of the police

5    department.

6          Q.   And did he tell you what else he did when

7    he left that application?

8          A.   No.   He said he served the application on

9    Mr. Giaimo and, I'm sorry, Mr. Coscenza and left the

10   other copy at the police department.

11         Q.   Did you bring anything with you to the

12   interview?

13         A.   No.

14              MS. FOURNIER:   Objection to the

15   form.

16         Q.   Well, let me withdraw that.   Did Mr. Baldo

17   come down to the police station?

18         A.   Yes, he did.

19         Q.   And what did you say to him?

20         A.   I asked him to explain the motions or the

21   procedure he took in serving the restraining order and

22   he did.

23         Q.   Did you say anything else to him?

24         A.   I don't believe so.

25         Q.   Did you show him the application or show

47

1    him anything?

2           A.   I may have.   I don't remember.

3           Q.   So it's your testimony that nobody asked

4    you to have him in or look into this issue with

5    respect to the restraining order, but you did it of

6    your own accord?

7           A.   I don't really recall how it came about.

8    The question came up during the investigation.

9    Whether I was asked to look into it further or just

10   did it I don't remember.

19

23

24

25

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of

Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition

was by me duly sworn and thereupon testified as appears in the foregoing

deposition; that said deposition was taken by me stenographically in the

presence of counsel and reduced to print under my direction, and the

foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the

parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____ day of

_____ , 2003

_____

NOTARY PUBLIC

My Commission Expires:
5/2005